1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CORDERICK GAGE,                        No.  1:19-cv-00308-SKO (HC)

12              Petitioner,                   **ORDER DENYING PETITION FOR WRIT
                                             OF HABEAS CORPUS**
13
                                             **ORDER DIRECTING CLERK OF COURT
14        v.                                 TO ENTER JUDGMENT AND CLOSE
                                             CASE**
15    RAYMOND MADDEN, Warden,
                                             **ORDER DECLINING ISSUANCE OF
16              Respondent.                   CERTIFICATE OF APPEALABILITY**

17

18          Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

19   to 28 U.S.C. § 2254.  He is represented in this action by Robert J. Beles and Joseph L. Ryan of

20   the Law Office of Beles and Beles.  He is currently serving a sentence of 25 years for convictions

21   of robbery and assault with a firearm.  He filed the instant habeas action challenging the

22   conviction.  As discussed below, the Court finds the claims to be without merit. Therefore, the

23   petition will be **DENIED.**[1]

24   **I.     PROCEDURAL HISTORY**

25          On June 20, 2014, in the Kern County Superior Court, following a jury trial, Petitioner

26   was found guilty of three counts of robbery (Cal. Penal Code § 212.5(c)) and two counts of

27   ────────────────────────

28   [1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of the magistrate judge for all
     purposes including entry of final judgment. (Docs. 3, 7.)

assault with a firearm (Cal. Penal Code § 245(a)(2)). People v. Packard, No. F070008, 2017 WL 3725941, at *1 (Cal. Ct. App. 2017), *review denied* (Cal. 2017). In a bifurcated proceeding, the trial court found true an allegation Petitioner had a prior serious felony conviction within the meaning of the prior serious felony conviction enhancement (Cal. Penal Code § 667(a)) and California's Three Strikes Law (Cal. Penal Code § 667(e)). Id. The trial court sentenced Petitioner to an aggregate determinate term of 25 years. Id. at *2.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On August 30, 2017, the Fifth DCA affirmed the judgment. Id. Petitioner filed a petition for review in the California Supreme Court, and the petition was denied on December 13, 2017. Id.

On March 5, 2019, Petitioner filed the instant petition for writ of habeas corpus. (Doc. 1.) Respondent filed an answer on June 11, 2019. (Doc. 10.) On October 1, 2019, Petitioner filed a traverse. (Doc. 18.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

*Robbery of Dispensary*

Darin Phillips was working at American Green Farmers, a medical marijuana dispensary in Bakersfield, about 3:00 p.m. on May 11, 2012. Owner Kevin Moats and receptionist Shanta Jones were working at the dispensary with Phillips. From a front door, patients entered a reception room with a check-in counter that Jones sat behind. Jones greeted patients, verified their paperwork and checked them in, and enrolled new patients. To the left of the reception room was the dispensary, also known as the bud room, with a door to the street that was always locked.

Jones heard a knock at the door, and when she opened it she saw two African–American men who appeared to be in their 20's. One of the men had a darker complexion and a tattoo on his neck. When Jones asked if they were new patients, the man with the darker complexion did not respond but ran into Jones and knocked her backward onto the floor. Jones felt blurry or dazed when she hit the ground and started screaming.

Phillips heard Jones scream and sounds of commotion from the room adjacent to the bud room. When he entered the bud room, Phillips saw one of the two men hitting Moats over the head. Moats was on his knees with his hands balled into fists. Phillips

_____

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

punched Moat's assailant on the left side of the man's face. The man spun around and placed a silver handgun to Phillip's head. As Phillips grabbed the man's right arm and pushed the gun to the side, the gun fired a round next to Phillips's head.

Jones heard two or three gunshots from where she was lying on the ground. When Jones noticed no one was around her, she ran out the door and down the street where she borrowed the cell phone of a passerby to call 911.

Phillips and the armed assailant fell to the ground. The assailant had his knee on Phillips's chest. Phillips locked his arms so the assailant could not put the gun back in his face. Moats came to Phillips's assistance, and both struggled to get the gun away from the assailant. The assailant yelled, "'I got two people in here.'" A second assailant, who was a little bigger than the first, came into the room carrying a larger handgun and pointed it at the heads of Moats and Phillips. The two assailants kicked and stomped Moats and Phillips until they told the assailants to take what they wanted. The second assailant covered his face with his T-shirt and told Phillips not to look at him.

The assailants asked where the marijuana was. Phillips pointed to where it was in the room. The assailants took a large travel duffle bag from the store that already contained Ziploc bags of marijuana for restocking. Phillips could hear the second assailant with the larger gun taking glass jars of marijuana from the bud room. The first assailant demanded to know the location of the money. He was directed to a shelf with Tupperware containers of cash; the assailants took the containers, which had between $500 and $700. The first assailant seemed excited and said, "'I can't believe you made me shoot my gun.'" Both assailants were wearing blue surgical-type gloves.

The assailants asked Phillips and Moats about the safe. Phillips told them it was down the hall in the kitchen area and offered to open it for the assailants, but they would not let Phillips and Moats get up. Phillips gave them the code to open the safe, which worked on a digital keypad, but he did not tell them they had to push "Start" on the keypad before entering the numeric code. Phillips said it seemed there were multiple unsuccessful attempts to open the safe.

The assailants returned to the victims, demanding the video recording tapes from the camera surveillance system. Phillips told them there were no tapes because the system was digital, so one of the assailants slammed the system on the ground four or five inches from Phillips's face. After the assailants fled through different exits, Phillips found a patient on the floor of the reception area who had been duct-taped and hog-tied with electrical cord. There were bullet holes in the wall and in the ceiling of the room where Phillips and the assailant struggled over the gun.

Patient Derrick Hudson was about to enter the dispensary when he saw a young African–American man with a dark complexion running out the front door. The young man had a blue or black scarf or do-rag on his head. Hudson saw the man for three to four seconds but was not wearing his glasses at that time, though he was wearing them during his testimony.

*Immediate Post-robbery Investigation*

Detectives William Hughes and Dennis Murphy responded in an unmarked gold Ford Crown Victoria. Enroute, the communications center broadcast information describing two Black robbery suspects. Hughes took Chester Avenue and turned onto 5th Street with emergency lights activated. He noticed three Black males inside

3

a late model, four-door black Toyota Camry waiting behind two vehicles at a stop sign.

As Hughes passed the Camry, the driver looked at Hughes and slid back behind the car's B pillar. The passengers also slumped away from view. Hughes made a U-turn and followed several cars behind the Camry. It soon made a sweeping right-hand turn onto 8th Street, failing to stop for the red light. The Camry rapidly accelerated eastbound until it made a turn onto L Street, stopping in the front yard of a residence on the 700 block of L Street. Three Black males exited the car, leaving the doors open.

As Hughes got out of his car, he looked directly at the driver of the Camry, whom he identified as Packard. The detective could smell a strong odor of fresh marijuana emanating from the car. Bakersfield police officer Jeff Martin and his canine partner Titan arrived at the scene. Titan and Martin came to a carport where a gray SUV was parked.

Packard was hiding underneath the SUV. Martin instructed him twice to come out with his hands up or he would send his dog in. Another officer also gave the same two commands for Packard to come out. After Packard ignored Officer Martin's commands for him to crawl out, the officer gave Titan a command to engage. Titan went under the SUV and bit Packard on his right biceps. Titan pulled Packard out as Packard tried to pull himself back under the SUV. Titan followed Martin's command to release Packard, who was then handcuffed and arrested.

Detective Nathan Anderberg found a pair of clean white cotton gloves behind a piece of siding on the south side of the residence, about 50 feet away from where Packard was detained. Officer Isaac Aleman discovered a black Samsung cell phone near where Packard was detained. The call log on the phone had been deleted. Detective Brent Stratton obtained the number for the Samsung phone from the service carrier, MetroPCS, and Packard confirmed it was his cell phone number.

Aleman assisted with serving a search warrant at Packard's residence on West Drive. He found items of mail addressed to Packard, a black leather holster for a firearm, and men's and women's clothing and shoes.

Crime scene technician Jeffery Cecil found a .25–caliber casing in the back employee room of the dispensary. There was duct tape on the floor of the back hallway of the business.

Searching the car, Cecil located an Interarms nine-millimeter semiautomatic firearm loaded with seven .380–caliber bullets on the front passenger floorboard of the Camry. There was a gray and red Chicago Bulls hat on the front passenger seat. Cecil determined the marijuana in the various jars totaled 316 grams.

A duffel bag found in the rear passenger's side of the Camry contained multiple jars of different brands of marijuana with a total of 1,030 grams of marijuana. Cecil found a red ball cap with an "A" and a halo symbol on the rear seat. Inside a Spiderman backpack on the rear driver's side floorboard was a white cotton glove, a package for gloves, and a wrapper for duct tape. Cecil located a second glove package wrapper in the car. There was a MetroPCS cell phone in the rear passenger's side door panel.

The cell phone rang several times during the search, and Stratton answered it when it rang. During one call someone asked for "Nunu." During a previous traffic stop,

4

Thomas told Bakersfield police officer Jared Ashby he went by the name Nunu. The e-mail address associated with the cell phone included Thomas's name. The phone contained several "selfies" of Thomas. One text message that came in was "Nunu?" The detective determined the cell number for the phone was associated with Thomas.

There was a photograph on the phone of the semiautomatic nine-millimeter firearm found in the Camry with a text message reading, "I got a thang 4 sale." The reply text message asked, "what kind." The response stated, "9 MM that also shoots .380's." Stratton explained .380–caliber bullets could fit into the chamber of a nine-millimeter gun because they were both the same diameter, though the .380–caliber bullet is shorter in length.

*Identification Evidence*

Phillips identified Thomas in court as the first assailant who held the gun to his head during their struggle. Phillips identified Thomas from a photographic lineup sometime after the robbery. Phillips identified Gage in a separate photographic lineup. Jones separately identified Thomas from a photographic lineup. She told Stratton she was 60 percent certain of her identification. Jones explained the man's eyes and facial structure were similar to the suspect's.

Hudson identified Thomas from a six-pack photographic lineup shown to him by the detective. Hudson described Thomas as the man who had run past him. He was only 10 percent sure of his identification. The man in the lineup was a dark person, but Hudson believed the man he had seen was younger than the individual in the photographic lineup.

Jones also identified Gage from a photographic lineup. Jones said she was 75 percent certain of her identification of Gage. Jones told officers she chose the subject because he had the same eyes as the robber. She was unable to see the silver-dollar-sized tattoo on the left side of the suspect's neck because the photograph was a headshot. Jones believed the man may have had more tattoos in addition to the one she described.

In her report to police, Jones described one of the perpetrators as a Black male adult, 19 to 21 years old, dark complexion, wearing either a royal or navy blue shirt and shorts, with a silver-dollar-sized tattoo on the left side of his neck, approximately six feet tall, with a thin build. Jones specified this suspect was the one who had knocked her to the ground. She described the second perpetrator as a Black male adult with a dark complexion, 19 to 21 years old, wearing a black T-shirt and dark jeans. Jones believed the second perpetrator may also have had tattoos.

*DNA Evidence*

Jerry Garza, a DNA expert, extracted DNA from the swabbed sample taken from the red Angels hat. Garza could not exclude Packard as a major contributor. Using random match probability, the probability of selecting an unknown, unrelated person from the Caucasian population with the same DNA major profile as Packard was one in 260 trillion, one in 14 trillion for the African–American population, and one in 8.2 quadrillion for the Hispanic population.

Garza obtained a mixture of DNA from the red and gray Chicago Bulls hat.

*Defenses*

Gage presented an alibi defense based on his testimony as well as the corroborating testimony of a friend from childhood and the mother of his child. Gage also had an innocent explanation for telephone calls or text messages he made to his codefendants before and during the time of the robbery. This evidence will be presented in greater detail below.

Thomas's mother confirmed her son went by the nickname Nunu, which she gave him when he was young. Thomas was also involved with his mother's nonprofit ministry in her church, which works to prevent gang violence in their neighborhood. Thomas had tattoos of the names of a friend and his uncle, as well as tattoos of a checkered race flag and lips under his left ear.

Packard's counsel called Dr. Scott Fraser as an eyewitness identification expert. Dr. Fraser identified the factors known scientifically to influence eyewitness memory, accurate recall, and subsequent identification. The accuracy of identification is reduced by situations with fear and high stress. The physiological response to stress affects memory and the subsequent ability to recognize people. So does the presence of a gun. People are less accurate in identifying members of a different race than members of their own race. The more often a person is shown an individual in a live or photographic lineup, or at a court hearing, the person becomes progressively more certain of an identification.

Dr. Fraser explained there were several ways a lineup could be suggestive. The Department of Justice protocol favors sequential or one-by-one lineups rather than simultaneous ones and also double blind presenters so the person administering the lineup is unaware of the suspect's identity. Some jurisdictions require all lineups be recorded by audio or by audio and video to verify the reliability of the procedure. These procedures were not followed here but would have made the witness identifications more reliable. Dr. Fraser described the six-pack photographic identification procedure used by investigators in this case as "a roll of the die."

Packard, 2017 WL 3725941, at *2-6.

**III.    DISCUSSION**

    A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

7

Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    Review of Petition

The petition presents the following claims for relief: 1) the state court erred in concluding that Petitioner was not entitled to relief where the trial court denied him right to due process by repeatedly denigrating counsel in front of the jury, showing a strong bias against Petitioner; 2) the state court erred in concluding that Petitioner was not prejudiced by trial counsel's unreasonable failure to present cell phone records corroborating Petitioner's testimony, especially where the jury specifically requested the records during deliberations; and 3) the state court's conclusion that there was substantial evidence for the jury to find Petitioner guilty of count 3 was unreasonable and denied Petitioner his constitutional rights.

1.    Judicial Bias

Petitioner claims there were several instances where the trial court exhibited an obvious

8

bias against defense counsel in front of the jury. He asserts that the judge's actions violated his right to a fair trial and due process under the Fourteenth Amendment. Petitioner raised this claim on direct review. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Gage contends the trial court exhibited bias against him and his trial counsel during voir dire of potential jurors. The People respond Gage failed to raise this issue at trial, forfeiting the claim for appellate review, and the trial court acted well within its discretion during voir dire in limiting the scope of some questions by counsel and sustaining the prosecutor's objections to other questions. We find no error.

> *Voir Dire Proceedings*

> First Prospective Juror

> Gage's trial counsel, Benjamin Nkwonta, asked an early prospective juror (first prospective juror) whether it would influence how he viewed the case if he knew Gage and Thomas were gang members. The first prospective juror replied he did not think so. Nkwonta asked the first prospective juror if he understood it is not a crime for a person to be a gang member. The trial court cautioned Nkwonta not to go "there directly to this gentleman." Nkwonta replied he was "trying to elicit a question as to whether [the first prospective juror] will abide by the law." Nkwonta asked how it would impact the first prospective juror if he were to hear evidence Gage was a gang member with gang tattoos. The first prospective juror replied he did not know and would have to hear everything before making a decision. Nkwonta asked if the first prospective juror was saying the mere fact Gage was a gang member would "not influence you in any way?" The court cautioned Nkwonta that was not what the first prospective juror said. The court told Nkwonta to focus on what he said and cautioned counsel, "You're turning words." The first prospective juror responded that gang membership alone would not influence him.

> Nkwonta followed up, asking the court why it interposed an objection when the prospective juror was asked whether he thought it was not a crime for a person to be gang member. Nkwonta asked if he had misstated the law. The court clarified, noting the way Nkwonta turned that question around was treating the first prospective juror disrespectfully because counsel was putting words in his mouth and educating the juror about the case. The court noted this was not allowed.

> Outside the jury's presence, Nkwonta referred to the first prospective juror he had questioned and told the court it had challenged his credibility before that juror. Counsel denied turning the first prospective juror's words against him and took issue with the court's challenge. Nkwonta reiterated for the record he did not believe he had done anything wrong.

> Second Prospective Juror

> Nkwonta questioned another prospective juror (second prospective juror) about a relative who was apparently a gang member. The second prospective juror explained she had contact with him but not on a daily basis. When asked if she had very positive or negative feelings toward gangs, the second prospective juror replied she did not have association with them per se. Nkwonta asked the second prospective juror if she thought "it should be a crime for a person to be a gang member?" The trial court interposed its own objection, telling counsel the question was not fair and to please move on. Responding to the next question, the second prospective juror

9

said she would not prejudge someone who had a gang tattoo or automatically conclude the person was guilty of something.

### Third Prospective Juror

Nkwonta later encountered a prospective male juror (third prospective juror) and asked him if being a member of a gang should be a crime. The third prospective juror explained it would depend on whether the group were committing crimes and violations of the Penal Code. In argumentative fashion, Nkwonta told the third prospective juror that mere membership in a gang was not a crime. Nkwonta then began a hypothetical scenario involving a police officer taking the stand and talking about his personal contacts with "A" and "A" admitting several times to the officer he is a gang member. The court interposed an objection and told Nkwonta to move on to another thought.

Nkwonta again became confrontational with the third prospective juror and asked if he thought being a gang member should be a crime. The third prospective juror kept stating it would depend on the totality of the circumstances. Nkwonta went back to his scenario about police testimony concerning prior gang contacts. The court told Nkwonta he was asking the same question the court had told him not to ask. The court permitted Nkwonta to proceed with the question anyway and the third prospective juror said he would tend to think someone who admitted prior gang membership in the past would cause him to believe that person was guilty of the crimes he or she was currently charged with.

The third prospective juror then said he would follow the trial court's instructions that being a gang member alone is not a crime. Continuing his argumentative questioning, Nkwonta asked the third prospective juror that if he heard Gage was a documented gang member, would this fact alone lead him to conclude he was guilty of the charged offenses. The court interjected the question was unfair because it did not give a full picture of the third prospective juror's answers. In response to the court's question, the third prospective juror said he could follow the court's instructions.

The prosecutor asked the third prospective juror whether he would follow the law and use his common sense during deliberation. The third prospective juror said he could do that. The third prospective juror then left the courtroom while the parties discussed an apparent challenge to him for cause. The court told Nkwonta it was unfair to him and they had to come up with a different system for motions to challenge jurors for cause. Nkwonta, the prosecutor, and counsel for Thomas agreed the attorneys would raise their hands if they were going to challenge a juror for cause.

Nkwonta explained to the court that the essence of voir dire is to determine if a juror might have a hardship and has preconceived or prejudged opinions. Nkwonta viewed the third prospective juror as being "all over the map." Nkwonta said he felt shot down by the court. Nkwonta wanted to do his job, which included challenges for cause, the essence of the process. Nkwonta did not think the third prospective juror was answering his questions. Nkwonta pointed out the court's question about whether the prospective juror would follow the court's instructions would result in a yes to the question 100 percent of the time and there would be "no point in us having this exercise."

Nkwonta challenged the third prospective juror for cause. In denying Nkwonta's challenge for cause, the court ruled: "[Y]ou're isolating specifics, as to specifics in

a question within a context but no context to it. So—please. So within the context, the person is channeled with no background to make an answer to your question. And then you're providing information which is coming into the trial and getting his opinion on specific parts of it. That's not what we're doing."

### Fourth Prospective Juror

Nkwonta questioned a fourth prospective juror who had prior experience teaching juvenile delinquents. Nkwonta told this juror the prosecutor had to prove his case "beyond all reasonable doubt." The court interposed that this statement by counsel misstated the law. Nkwonta argumentatively replied, "Well, I don't think I did, Judge." The court asked Nkwonta to move on.

### Fifth Prospective Juror

Nkwonta asked a fifth prospective juror about the fact that only his client was charged with attempted murder. Nkwonta asked the prospective juror what went through his mind when the charge was first read to the venire. The fifth prospective juror said he wanted to look into it more because he wanted to know what happened. Nkwonta asked, "[Y]ou didn't think, I think he did it, something like that?" The fifth prospective juror replied, "No."

Nkwonta asked whether the prospective juror had ever mistaken someone he knew or a friend for someone else. The prospective juror replied affirmatively. Nkwonta asked, "This is a friend you have known for probably years and years." The prosecutor lodged an objection that the question was improper. The court found the question "on the line." Nkwonta repeated the question in similar form. The court told Nkwonta to move on. The trial court denied Nkwonta's motion for a sidebar discussion. The court further denied Nkwonta's request for clarification and told him to move on.

Nkwonta asked the prospective juror a third time about mistakenly identifying a stranger for a friend. The court sustained the prosecutor's objection and told Nkwonta to move on to another area of questioning. Nkwonta asked the prospective juror if an eyewitness pointed to Gage and said he did it, would this end the case for the prospective juror. The prospective juror said it would not because it was only one witness. Nkwonta asked about two witnesses, stating it does not "matter how many say that's the guy, I saw him, I am saying if, is the case over?" The prospective juror again replied, "No." Nkwonta asked why, and the prospective juror said, "Because we need more evidence."

Nkwonta asked if the prospective juror thought it was possible for a person to be mistakenly identified as the person who committed an offense when they were innocent. The prosecutor objected to the question as improper. The court told Nkwonta he had already asked this question and would ask him to sit down if he did not move on.

### Sixth Prospective Juror

Nkwonta asked a sixth prospective juror whether "it's possible for an eyewitness to a crime or some incident to mistakenly identify an innocent person as the person that committed that crime and say I am sure that is the person?" The court sustained the prosecutor's objection and told Nkwonta, "You've been warned."

11

After excusing the jury, Nkwonta asked the court to make a record. Nkwonta stated he believed the court was improperly limiting his voir dire. Nkwonta stated he had not asked a single question that was improper. Nkwonta argued he had only asked questions of seven jurors and only questioned them for about 15 minutes. Nkwonta explained his questions were designed to make sure the jurors were not prejudging the case. Nkwonta took issue with the prosecutor's objections to his questions and the court sustaining those objections.

The court thanked Nkwonta and noted that when the prosecutor objects, it is not a speaking objection and the court is very aware what counsel is doing. The court noted: "It's obvious to everyone you're preconditioning this jury. You were ordered yesterday to stop. You did. You were ordered three times today to stop. If you do it again in your voir dire, it will be a direct violation of a Court order. I'll take appropriate action at that time." The court asked Nkwonta if he understood. The court reminded Nkwonta the voir dire was for challenging jurors for cause, not preconditioning the jury or setting up counsel's argument. The court noted: "You've been ordered to stop. You're very aware of what's going on. You changed the wording. It's then appropriate for the Court."

Nkwonta proceeded later with his request to make a record. Nkwonta asked the court for further clarification concerning why the court would routinely deny his requests for sidebar discussions. The court said this would be done. The court noted it was cocounsel's turn for voir dire. The court observed it had asked Nkwonta to sit down three times the day before because he would not follow the court's instructions.

Later in that session, Nkwonta launched into a long objection, reiterating his discontent over the court not permitting sidebar discussions and seeking clarification concerning the basis for the court sustaining the prosecutor's objections to Nkwonta's questions.

Nkwonta made a motion to reopen voir dire on the basis his client had been limited to 10 minutes of questioning for a venire of 24 potential jurors. The court noted Nkwonta was an experienced attorney having conducted some 100 trials. The court denied the motion, finding Nkwonta's behavior the day before amounted to preconditioning of the potential jury. The court further noted it did not limit Nkwonta's questioning until he resumed his preconditioning conduct. The court denied Nkwonta's request for a sidebar on the last day of voir dire.

<u>Court's Interactions with Mr. Nkwonta During Trial</u>

After the trial began, Nkwonta reiterated his objections to the voir dire proceedings. The gist of the argument was the court had ridiculed him in front of the jury, limited his ability to question witnesses, and limited counsel's zealous advocacy. Nkwonta argued the proceedings were fundamentally unfair, and he sought a mistrial. The prosecutor noted there were multiple venire panels of 24 potential jurors each, and counsel were each afforded 30 to 35 minutes of questioning per panel. The prosecutor noted his objections were because Nkwonta's questions were improperly indoctrinating the jury.

Nkwonta argued the prosecutor would object and the court would sustain the objection without the prosecutor stating his basis for the motion; then the court would not permit Nkwonta the opportunity to have a sidebar discussion. The court stated it had never had a problem with Mr. Nkwonta's zealous advocacy, including the way he operates and conducts himself. The court further noted it did not want to cause a chilling effect on Nkwonta's advocacy. The court denied the motion for

mistral.

The court learned a juror was having difficulty understanding Mr. Nkwonta. The court advised the jury:

> "Again, basically on behalf of everyone in this courtroom, I appreciate your comment. It did get brought to me, with no disrespect, obviously, to Mr. N' Kwonta. Some of you are having trouble understanding him at times. Okay? And that's appreciated because Mr. N'Kwonta would ask for nothing less. If there's anything you don't understand, just put up your hand. I'll keep an eye on it, and we'll work with it.

> "He has certainly a strong accent. I was very pleased when he came here because I suddenly became better in everyone's eyes, so I appreciate all this to him. Bottom line is if you do have trouble, we'll clarify it. It's not a problem to Mr. N'Kwonta either. Again, thank you for doing that. That's a fantastic example of you doing your job, so much appreciated on behalf of everyone."

During Nkwonta's questioning of a witness at trial, he asked for a moment before proceeding. The court replied, "Absolutely. Your case. Don't worry about it." A similar exchange between the court and Nkwonta occurred later. On one occasion later in the trial, the court initially denied Nkwonta's request for a sidebar discussion but conducted it soon afterward off the record. Outside the jury's presence, the trial court noted the sidebar discussion took place. The court noted it understood Mr. Nkwonta's position and formulated a solution to it should the situation arise again. The court noted it was in no way trying to hamper counsel's ability to represent his client.

### Forfeiture

A party seeking disqualification of a judge must do so at the earliest practicable opportunity after discovery of the facts constituting the grounds for disqualification. (*People v. Scott* (1997) 15 Cal.4th 1188, 1205–1207.) It is too late to raise the issue for the first time on appeal and such a claim is forfeited. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1110–1111, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Gage failed to seek disqualification of the trial judge. This issue has been forfeited for appellate review. It also fails on the merits.

### Right to Impartial Judge

Defendants have a due process right to an impartial judge under the state and federal Constitutions. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309; *People v. Guerra, supra*, 37 Cal.4th at p. 1111.) The due process clause requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the defendant's particular case. (*Bracy v. Gramley* (1997) 520 U.S. 899, 904–905.)

Section 1044 states a trial court has the duty to control the trial proceedings. When an attorney engages in improper behavior, such as ignoring the court's instructions or asking inappropriate questions, the trial court is within its discretion to reprimand counsel as the circumstances require. (*People v. Guerra, supra*, 37 Cal.4th at p. 1111, citing *People v. Snow* (2003) 30 Cal.4th 43, 78.) A trial court's numerous rulings against a party—even when legally erroneous—do not establish a charge of judicial bias, especially when they are subject to review. (*People v. Guerra, supra*,

at p. 1112.) The role of the reviewing court is not to determine whether the trial judge's conduct left something to be desired or whether some comments would have been better left unstated. We determine whether the judge's behavior was so prejudicial it denied the defendant a fair trial as opposed to a perfect trial. (*People v. Snow, supra*, at p. 78.)

A trial court has considerable discretion to place reasonable limits on voir dire, including the number and nature of voir dire questions. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1286; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1120, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Limitations on voir dire are subject to review for abuse of discretion. (*People v. Zambrano, supra*, at p. 1120.)

It is well settled that examination of prospective jurors should not be used to educate the jury panel to particular facts of the case, to compel a potential juror to commit himself or herself to vote a particular way, to prejudice the jury for or against a party in the case, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law. (*People v. Abilez* (2007) 41 Cal.4th 472, 492–493; *People v. Fierro* (1991) 1 Cal.4th 173, 209, questioned on other grounds in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 205–207; *People v. Williams* (1981) 29 Cal.3d 392, 408.) A capital defendant does not have the right to ask specific questions on voir dire that educate the jury on the facts of the case or to instruct the jury in matters of law. (*People v. Tate* (2010) 49 Cal.4th 636, 657.)

We have found no examples of judicial bias in the record of the voir dire and evidentiary proceedings. The trial court limited Mr. Nkwonta's questioning of the jury only to the extent counsel was trying to indoctrinate the jury with his client's view of the case. Nkwonta inappropriately began to reference specific facts of the case to potential jurors and did so on several occasions during voir dire, ignoring the trial court's admonitions to avoid indoctrination. The trial court was acting well within its mandated duty to control the proceedings and to ensure a fair voir dire process for all of the parties. Furthermore, the court did not need the prosecutor to state the basis for his objections to Nkwonta's voir dire questions, as Gage argues on appeal, because it was very clear from the nature of Nkwonta's questions that he was inappropriately trying to educate and precondition the jury with the facts of the case and the law.

The trial court did not disparage Nkwonta's speech during trial as Gage argues on appeal. Mr. Nkwonta apparently spoke with a noticeable accent and the trial court asked jurors to indicate when they had any difficulty understanding him. The court did not mock Nkwonta but praised his skill as an advocate to the jury. In sum, we find no merit to Gage's contention that the trial court was biased against him or his trial attorney.

Packard, 2017 WL 3725941, at *14-19.

      a.  Procedural Default

As noted above, the state court found that Petitioner had forfeited his claim by failing to object to the actions of the judge at trial. Respondent contends that Petitioner's claim is thus procedurally defaulted. Petitioner contends that his claim is not barred because the state court applied California law incorrectly. The Court finds that the claim is procedurally defaulted.

1    Initially, the Court notes that it cannot consider Petitioner's argument that the state

2    appellate court incorrectly applied California law on federal habeas review. Essentially, Petitioner

3    seeks federal review of a state court determination of state law. A federal court may not do so.

4    See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) (federal court is bound by state

5    court determination of state law).

6        A federal court will not review a claim of federal constitutional error raised by a state

7    habeas petitioner if the state court determination of the same issue "rests on a state law ground

8    that is independent of the federal question and adequate to support the judgment." Coleman v.

9    Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination

10   is based on the petitioner's failure to comply with procedural requirements, so long as the

11   procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the

12   bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of

13   the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to

14   be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S.

15   1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it

16   unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

17   alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

18   fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

19       The Ninth Circuit has repeatedly held that California's contemporaneous objection

20   doctrine is clear, well-established, has been consistently applied, and is an adequate and

21   independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

22   Vansickel v. White, 166 F.3d 953 (9th Cir. 1999). The Ninth Circuit has held that the

23   contemporaneous objection rule also bars a claim of prosecutorial misconduct. Jackson v.

24   Giurbino, 364 F.3d 1002, 1006-07 (9th Cir. 2004). The Court agrees with Respondent that the

25   failure to object to the actions of the judge is sufficiently similar to bar the claim. Petitioner did

26   not challenge the actions of the judge and move for disqualification at any time. Therefore, he

27   waived his claim in state court and is procedurally barred from raising it here. In any case, as

28   discussed below, the claim is without merit.

1        b.   <u>Legal Standard</u>

The Due Process Clause guarantees a criminal defendant the right to a "'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." <u>Bracy v. Gramley</u>, 520 U.S. 899, 904-05 (1997) (quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 46 (1975). While common law, statutes, and professional standards may give guidance for when a judge should recuse himself or herself, only violations of the Constitution will result in the reversal of a conviction on writ of habeas corpus. <u>Bracy</u>, 520 U.S. at 904-05. There are cases where a judge's implied bias creates such a high probability of actual bias as to violate the Constitution. <u>Larkin</u>, 421 U.S. at 46. For example, the Supreme Court has found that Due Process requires disqualification of a judge when the judge has direct financial interest in the outcome of a case, <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 822-24 (1986), is faced with substantial direct personal insults and denigration from a litigant, <u>Mayberry v. Pennsylvania</u>, 400 U.S. 455, 466 (1971), or had significant prosecutorial and adjudicatory functions in the same case, <u>In re Murchison</u>, 349 U.S. 133, 134-6 (1955). These cases indicate a judge's implied bias violates the Constitution if the judge had "direct, personal [and] substantial" influences on him or some other incentive for bias. <u>See</u> <u>Aetna</u>, 475 U.S. at 822.

In attempting to make out a claim of unconstitutional bias, a plaintiff must "overcome a presumption of honesty and integrity" on the part of the judge. <u>Larkin</u>, 421 U.S. at 47. A judge is unconstitutionally biased if he has a deep-seated favoritism or antagonism that makes fair judgment impossible. <u>Mayberry</u>, 400 U.S. at 465-66. Recusal is required only if the judge's bias is 1) directed against a party; 2) stems from an extrajudicial source; and 3) is such as a reasonable person knowing all the facts would conclude that the judge's impartiality might reasonably be questioned. <u>Liteky</u>, 510 U.S. at 545-546. While the judge may have made rulings unfavorable to a petitioner, "[j]udicial rulings alone almost never constitute a valid basis" for finding bias. <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994) (citing <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 583 (1966)). "In the absence of evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to,

counsel, the parties, or their cases.'" Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting Liteky, 510 U.S. at 555).

Finally, if a criminal defendant is not tried by an impartial adjudicator, the error is structural, i.e., reversal is required without consideration of whether the error was harmless. Neder v. United States, 527 U.S. 1, 8 (1999); Gomez v. United States, 490 U.S. 858, 876 (1989) (denial of "right to an impartial adjudicator, be it judge or jury" can never be harmless error) (citation omitted).

c. Analysis

The state court reasonably determined that there was no evidence of judicial bias by the trial court. There is no indication that the trial judge had any financial interest in the outcome of Petitioner's case or that he had a prosecutorial function related to Petitioner in this case or some earlier case. Petitioner claims that the trial judge repeatedly denigrated and castigated his defense counsel in front of the jury such that it gave the appearance that defense counsel was behaving unprofessionally and unethically. In his traverse, Petitioner claims "there was evidence of a 'bitter controversy' which showed that the trial court was biased against trial counsel such that petitioner's trial was unfair." (Doc. 18-1 at 6.)

Upon review of the record, the Court does not find this to be the case. Although the trial judge may have been curt, cut defense counsel short on occasion, and admonished defense counsel when he repeatedly tried to indoctrinate the jury with his client's view of the case, there is nothing to support the allegation that the trial judge was embroiled in a bitter controversy with counsel, thereby rendering the trial unfair. On the contrary, the trial judge acted well within his mandate to control the proceedings. The judge politely responded to defense counsel's interjections on many occasions. (See, e.g., Doc. 11-47 at 72: "Mr. Nkwonta, your point is well-taken"; Doc. 11-47 at 73: "No, that's fair"). Although the trial judge sustained objections interposed by the prosecutor against defense counsel, he also sustained defense counsel's objections to the prosecutor. (See, e.g., Doc. 11-46 at 179-180). The court also apologized to defense counsel when the court erred. (See, e.g., Doc. 11-47 at 170: "Mr. Nkwonta, I'm not being fair to you here . . . . Thank you, Mr. Nkwonta. We will revisit, it's only fair"; Doc. 11-47

17

at 171-72: "Sorry sir, did you get the last one?"); Doc. 11-27 at 104: "Again, thank you, Mr. Nkwonta. That was unfair with that situation. So thank you. Yes, your comment.") And, there were many occasions where the court was sensitive to defense counsel's concerns. For instance, defense counsel sought to introduce certain phone records, but counsel for codefendants argued against their admission. The trial court responded to defense counsel, stating: "No, no. This is what we'll do. You're frustrated. This is a big point to you. You feel unclear on it. I don't want that to happen. Therefore, don't touch this issue this morning as to Sergeant Stratton. Put him on re [sic]. We'll allow you to reopen on that once you've done some research, presented it to counsel." (Doc. 11-27 at 23.)

Thus, while the court may have been short and direct on occasion, he was so to all parties including the prosecutor, all three defense attorneys, the witnesses, and the jury. There was no evidence of any deep-seated antagonism by the trial judge toward Petitioner's defense counsel or any behavior that would imply a bitter controversy between them. The court's behavior appears to be nothing more than conduct the Supreme Court had previously found inadequate to show bias:

> . . . judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.

Liteky, 510 U.S. at 556. There is simply no evidence whatsoever of any judicial bias in this case that could form the basis of a constitutional claim. Certainly, Petitioner has not shown that the state court rejection of his claim was contrary to or an unreasonable application of controlling Supreme Court authority. The claim will be denied.

2. Ineffective Assistance of Counsel

Next, Petitioner alleges counsel was ineffective in failing to present cellphone evidence which corroborated his testimony. Based on the jury's request to see those records during deliberations, Petitioner concludes he was prejudiced by counsel's deficient performance. This claim was also raised on direct review in the state courts. The Fifth DCA rejected the claim in the last reasoned decision, as follows:

Gage contends his trial counsel was ineffective because he failed to subpoena and

18

introduce Gage's phone records. Gage argues the phone records were exculpatory because they supported his misidentification defense by corroborating his testimony that he called the codefendants at the time the robbery occurred. According to Gage, his counsel failed to obtain admissible records from the phone company but relied on procedurally defective records subpoenaed from law enforcement prior to trial but could not be authenticated.

*Facts and Proceedings*

Detective Stratton obtained and executed a search warrant of MetroPCS phone records of Gage's phone calls at the time of the robbery. The records were made available to defense counsel prior to trial. During in limine motions, the prosecutor informed the court the phone records were in the custody of the Bakersfield Police Department and he planned to have a custodian of records from MetroPCS verify the records and lay a foundation for text messages sent and calls made. Counsel for Gage's codefendants indicated there could be hearsay challenges to the admissibility of phone call evidence because subscriber information from the phone company may have no correlation to who used the phone to make a call.

On behalf of Gage, Nkwonta sought to introduce phone records of all three defendants, including their text messages for the time period two hours before and two hours after the robbery. Nkwonta planned to use the exhibits to cross-examine Detective Stratton and to show Gage was not with Packard or Thomas during the robbery.

Packard's counsel objected to the introduction of the entirety of the evidence because it was "a huge amount of stuff that nobody here is going to be able to go through in the time that we're going to have to argue it." Packard's counsel further pointed out defense counsel had negotiated before trial began concerning which phone records and text messages would come into evidence, and this was the first time Mr. Nkwonta sought to have it introduced. Packard's counsel further argued he would move for a mistrial pursuant to *Aranda/Bruton* [Fn.7.] if the phone records were admitted into evidence. The court tentatively denied Gage's motion to introduce all of the phone records but asked Nkwonta to prepare a condensed version of the records he wanted to present, and to present it to all counsel.

> [Fn.7.] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

The court revised the admissibility of the phone records. Packard's counsel objected to their admission on foundation, authentication, hearsay, and *Aranda/Bruton* grounds. Thomas's counsel and the prosecutor joined in these objections.

The court ruled that subject to his ability to lay a proper foundation, Nkwonta could introduce documents of phone records as long as the content was not used. Which party called whom, for instance, would not be admitted. The court ruled the fact, however, that Gage was on the phone was and is itself relevant to Gage's defense and was admissible.

The court clarified its ruling to Mr. Nkwonta, noting:

> "When you've got the codefendant situation, that *Aranda–Bruton* doesn't always work for everybody. ... You've got the issue of ID here. In other words, who were they actually on the phone. The phone number itself doesn't mean they were on the phone. They can't cross-examine that.... [¶] So to

protect you and give you your defense, which you're entitled to and the Court is not stopping that.

"So I'm being very clear, now I want everyone to be clear, that the examination of this witness if, one, you can get the foundation in, if you can get beyond that, you can certainly look at it and refer to it, but I'm gonna instruct that the only issue is was he on the phone at that time?"

Nkwonta questioned Detective Stratton on cross-examination about the phone records obtained from MetroPCS after executing a search warrant, including information about Gage's phone that was a target number of the warrant. Over the course of Nkwonta's questioning of Stratton, counsel for codefendants had their objections sustained by the court based on lack of foundation, speculation, hearsay, and narrative grounds. Nkwonta subpoenaed phone records from MetroPCS and presented them to the court after the People had rested their case. The court found the phone records inadmissible as the affidavit executed by the custodian of records failed to comply with Evidence Code section 1561.

Gage testified on his own behalf, explaining he called Packard on his way to the park and also sent text messages to Packard. Gage testified he had contact with Packard on the day of the robbery about nine times between 11:25 a.m. until 3:16 p.m. Toward the end of a call to Packard at 3:04 p.m., Gage testified he heard sirens in the background. Gage also contacted or tried to contact Thomas several times between 2:03 p.m. and 3:02 p.m. the day of the robbery.

During deliberations, the jury sent a note to the court asking if the phone records were available. The court told the jury the records were not available. The jury further informed the court it had reached verdicts on the other two defendants but not Gage. The jury wanted to know how much longer it needed to deliberate if one person would not change. The court informed the jury its deliberations were solely its domain. The court read the jury CALCRIM No. 3551, a standard instruction informing the jurors not to hesitate to reexamine their own views and to not change a position just because it differs from that of other jurors in order to reach a verdict. Before reaching verdicts on the allegations against Gage, the jury sought a rereading of Gage's testimony concerning the calls he made and received the day of the robbery.

*Analysis*

Defendant has the burden of proving ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Williams v. Taylor* (2000) 529 U.S. 362, 391, 394; *In re Hardy* (2007) 41 Cal.4th 977, 1018.) A reasonable probability is one sufficient to undermine confidence in the outcome. The second question is not one of outcome determination but whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. (*In re Hardy, supra*, at p. 1018.)

A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Tactical errors are generally not deemed reversible. We evaluate counsel's decisionmaking in the context of the available facts. To the extent the record fails to disclose why counsel acted or failed

to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Attorneys are not expected to engage in tactics or to file motions that are futile. (*Id*. at p. 390; see *People v. Mendoza* (2000) 24 Cal.4th 130, 166.)

On direct appeal, reversal of a conviction for ineffective assistance of counsel will only occur if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there could be no satisfactory explanation for counsel's choices. All other claims of ineffective assistance of counsel are more appropriately resolved in a habeas corpus proceeding. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Gage argues authenticated cell phone records would have corroborated his own testimony that he was talking to the codefendants at the time of the robbery. Because the jury requested the records during deliberation, Gage could have also corroborated his testimony that he heard sirens toward the end of his last call to Packard, which would show he was not in the getaway car and not with the codefendants during the robbery.

The problem with Gage's assertion of ineffective assistance of trial counsel is that even if Gage can show Mr. Nkwonta's representation fell below professional standards because he did not obtain authenticated phone records from MetroPCS, there is no demonstration authenticated records would have acted as strong corroboration of Gage's testimony. Even with authenticated records there would still be foundation problems. Showing that Gage was calling numbers registered to Packard and Thomas would not prove he was talking to either one of them. It appears neither Packard nor Thomas would have testified to corroborate they had talked to Gage. Authenticated phone records would be circumstantial and indirect corroboration of Gage's testimony concerning the phone calls.

Gage testified at length during trial that he called Packard and Thomas just before and during the robbery. The jury heard a readback of this testimony during its deliberations. Gage's testimony provided an innocent explanation for phone calls with his codefendants. It is speculative, at best, to assume circumstantial and indirect corroboration of Gage's testimony with authenticated phone records would have caused the jury to reach a different verdict on the allegations against Gage. We do not agree there was a reasonable probability the jury would have remained deadlocked or reached a different verdict had Mr. Nkwonta successfully obtained authenticated phone records.

Packard, 2017 WL 3725941, at *19-22.

a.  Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466

21

1    U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

2    Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding

3    that where a defendant has been actually or constructively denied the assistance of counsel

4    altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

5    that Strickland does apply where counsel is present but ineffective).

6         To prevail, Petitioner must show two things. First, he must establish that counsel's

7    deficient performance fell below an objective standard of reasonableness under prevailing

8    professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he

9    suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

10   errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

11   sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

12   counsel could have done; rather, it is whether the choices made by counsel were reasonable.

13   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

14        With the passage of the AEDPA, habeas relief may only be granted if the state-court

15   decision unreasonably applied this general Strickland standard for ineffective assistance.

16   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a

17   federal court believes the state court's determination under the Strickland standard "was incorrect

18   but whether that determination was unreasonable–a substantially higher threshold." Schriro v.

19   Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard

20   is "doubly deferential" because it requires that it be shown not only that the state court

21   determination was erroneous, but also that it was objectively unreasonable. Yarborough v.

22   Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a

23   state court has even more latitude to reasonably determine that a defendant has not satisfied that

24   standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

25   application was unreasonable requires considering the rule's specificity. The more general the

26   rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

27              b.   Analysis

28        In rejecting the claim, the state court applied the correct standard and concluded that

Petitioner suffered no prejudice. Therefore, the only question before this Court is whether that determination was objectively unreasonable. The Court finds that it was not.

The state court ruled that the cellphone records were inadmissible as a matter of state law. The federal court is bound by the state court's determination of its own law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Even if defense counsel could have obtained admissible, authenticated phone records, the appellate court determined that under state law those records still suffered from foundation problems. In addition, the records at most would have shown that Petitioner's cellphone connected with his codefendants' cellphones. In his traverse, Petitioner argues that it is absurd to assert that Petitioner texted and called his codefendants while sitting in the same vehicle, but this too is speculative. The records would not have shown that Petitioner personally spoke to or contacted either one of them—only that his cellphone connected to their cellphones. In addition, the records would not have proven that Petitioner was not with his codefendants in the vehicle or in the same geographical location when the calls or texts were made. A fairminded jurist could agree with the state court that the evidence was speculative, and at best, only circumstantial and indirect corroboration of Petitioner's testimony. For this reason, Petitioner has not shown the state court to be unreasonable in concluding that there was not a reasonable probability that the verdict would have been different but for counsel's failure to introduce the phone records. The claim will be denied.

### 3. Insufficiency of the Evidence

In his final claim for relief, Petitioner alleges there was insufficient evidence to find him guilty of count 3, the robbery of Shanta Jones. He claims there was insufficient evidence to support the finding that Jones had constructive possession of the stolen goods, and he claims there was insufficient evidence showing the items were stolen from Jones' immediate presence. Petitioner raised this claim on direct review. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> All three defendants contend there was not substantial evidence they took or asported marijuana and cash from the American Green Farmers marijuana dispensary in the immediate presence of Shanta Jones, count 3 of the amended information. Gage and Thomas argue Jones was unaware a robbery was taking place and was not handling or in physical control of the property stolen. We find no error.

23

Under California law, an employee may be the victim of robbery even though he or she is not in charge or in immediate control of the items stolen at the moment of the taking. (*People v. Scott* (2009) 45 Cal.4th 743, 753.) *Scott* held employees have constructive possession of their employer's property when they are present during a robbery. Constructive possession requires only that there be some type of special relationship with the owner of the property sufficient to demonstrate the victim had authority or responsibility to protect the stolen property on behalf of the owner. (*Ibid.*) The victim need not have general authority to control the owner's property in other circumstances. (*Id.* at p. 754.)

In analyzing constructive possession authorities, the court in *Scott* relied on *People v. Gordon* (1982) 136 Cal.App.3d 519, which held the defendant committed robbery when he pointed a gun at the parents of the adult son who lived in the parents' residence and then proceeded to the son's bedroom to steal property. (*Id.* at pp. 523–524; *People v. Scott, supra*, 45 Cal.4th at pp. 753–754.) *Gordon* affirmed robbery convictions as against both parents, noting the victims were responsible for preserving the property taken. The *Gordon* court found constructive possession by the parents of their adult son's personal items. (*Gordon, supra*, at p. 529; *Scott, supra*, at pp. 753–754.)

The court in *Scott* further relied on *People v. Gilbeaux* (2003) 111 Cal.App.4th 515, 523, which applied the constructive possession rule to two independent contractor janitors who were present at the robbery of a grocery store even though they had no responsibility for handling cash. The janitors were found to be in a special relationship with the grocery store and had sufficient representative capacity to the store to be in constructive possession of the stolen property. (*People v. Scott, supra*, 45 Cal.4th at p. 754.)

*Scott* reasoned that "[a]lthough not every employee has the authority to exercise control over the employer's funds or other property during everyday operations of the business, any employee has, by virtue of his or her employment relationship with the employer, some implied authority, when on duty, to act on the employer's behalf to protect the employer's property when it is threatened by a robbery." (*People v. Scott, supra*, 45 Cal.4th at p. 754.) The employees are in possession of the property as against anyone who attempts to steal it, and they have authority to protect the employer's property under Civil Code section 50 to use necessary force to protect the property, themselves, family members of the employer, other relatives, wards, servants, the employer, or guests. (*Scott*, at p. 754.)

Gage and Thomas argue Jones was knocked down near the front door reception area of the dispensary where she worked. After hearing gunshots, Jones got up and ran out the front door. She kept running down the street until she found someone with a cell phone and called 911. Jones conceded she did not initially see either defendant holding a gun. By the time the robbery was completed, Jones was gone from the dispensary and out of the zone of immediate presence of the owner's property. Because the security room and bud room of the dispensary were normally locked, and because Jones only opened the door for a patient after confirming her verification of the patient, defendants argue she did not have physical control over the locked rooms or of the property inside those rooms. They further argue there was insufficient evidence the removal of property occurred in Jones's immediate presence.

We find these arguments unpersuasive. Defendants concede Jones had control over who went past the locked door after verifying a patient was a legitimate customer of

the dispensary. Jones did not stay in the dispensary once she was aware there was a robbery in progress. It is immaterial whether she saw either defendant holding a gun. Any reasonable person would be prudent to assume the thieves entering the dispensary were armed. Generally, the accepted definition of immediate presence is that the object of the robbery is in the immediate presence of a person with respect to the robbery, which is so within the victim's reach, inspection, observation or control, that he or she could, if not overcome by violence or prevented by fear, retain possession of it. (*People v. Abilez, supra*, 41 Cal.4th at p. 507 [deceased victim need not be aware of force used to take property and is still within the immediate presence of the property stolen].)

Defendants used force against Jones, knocking her to the ground, to acquire entry into the rooms in the dispensary with the property they sought to steal. Once on the ground, Jones could no longer reach, observe, or control the door into the back of the dispensary. As noted in *People v. Scott*, Jones stood in a special relationship with her employer whether or not her regular duties included control over cash or the product for sale. She was wise not to remain on the premises after hearing gunfire during the course of the robbery. Jones continued, however, to fulfill her responsibilities as a dutiful employee and sought a passerby to call 911 in order to protect not only her employer's property, but those persons remaining in the dispensary after she left. We find substantial evidence Jones stood in a special relationship with her employer and was also the victim of defendants' robbery.

Packard, 2017 WL 3725941, at *22-23.

a. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

b. Analysis

As set forth above, the state court determined that, as a matter of state law, an employee is in constructive possession of a business's property during a robbery. Packard, 2017 WL 3725941, at *22 (citing People v. Scott, 45 Cal.4th 743, 753 (2009)). Petitioner may not dispute this determination here, insofar as the federal court is bound by the state court's determination of its own law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Petitioner makes no argument that Shanta Jones was not an employee of the business during the robbery. Therefore, he fails to demonstrate that Jones was not in constructive possession of the stolen goods.

Petitioner's challenge to the immediate presence requirement likewise fails. It is undisputed that Jones had control over the entry to the room where the stolen goods were kept. The state court found that as a matter of state law, the immediate presence requirement is met if the object of the robbery "is so within the victim's reach, inspection, observation or control, that

he or she could, if not overcome by violence or prevented by fear, retain possession of it."
Packard, 2017 WL 3725941, at *23 (citing People v. Abilez, 41 Cal.4th 472, 507 (2007)).  As
noted by the state court, the defendants knocked Jones to the ground to gain access to the room
where the stolen goods were kept. Petitioner thus fails to show that the state court rejection of his
claim was objectively unreasonable.

## IV.     CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a
district court's denial of his petition, and an appeal is only allowed in certain circumstances.
Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003).  The controlling statute in determining
whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a)      In a habeas corpus proceeding or a proceeding under section 2255 before a district
> judge, the final order shall be subject to review, on appeal, by the court of appeals for the
> circuit in which the proceeding is held.
>
> (b)      There shall be no right of appeal from a final order in a proceeding to test the
> validity of a warrant to remove to another district or place for commitment or trial a
> person charged with a criminal offense against the United States, or to test the validity of
> such person's detention pending removal proceedings.
>
> (c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal
> may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention
>> complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the
> applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which
> specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of
appealability when a petitioner makes a substantial showing of the denial of a constitutional right.
28 U.S.C. § 2253(c)(2).  To make a substantial showing, the petitioner must establish that
"reasonable jurists could debate whether (or, for that matter, agree that) the petition should have
been resolved in a different manner or that the issues presented were 'adequate to deserve
encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting

Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Thus, the Court DECLINES to issue a certificate of appealability.

## V.    ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The Petition for Writ of Habeas Corpus is DENIED with prejudice on the merits;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

This order terminates the action in its entirety.

IT IS SO ORDERED.

Dated:    **October 15, 2019**                    _/s/ Sheila K. Oberto_
                                    UNITED STATES MAGISTRATE JUDGE